UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

THERESA M. GOFF,

       Plaintiff,

v.                                                            1:05-CV-147 (NPM)

JO ANNE BARNHART,
Commissioner of Social
Security Administration,

       Defendant.

---

APPEARANCES                                          OF COUNSEL

Erwin, McCane & Daly                                 Thomas C. Erwin, Esq.
Attorney for plaintiff
23 Elk Street
Albany, New York 12207

Office of the United States Attorney                 William H. Pease, Esq.
Attorney for defendant
100 South Clinton Street
Syracuse, New York 13261-7198

NEAL P. McCURN, Senior U.S. District Court Judge

## MEMORANDUM - DECISION AND ORDER

Plaintiff Theresa Goff ("Goff") brings this action pursuant to § 205(g) of the

Social Security Act (the "Act"), codified at 42 U.S.C. §§ 405(g), seeking review of

the final decision of the defendant Commissioner of the Social Security

Administration ("Commissioner") denying plaintiff's claim for disability insurance benefits ("DIB") under the Act. For the reasons stated below, the Commissioner's decision is reversed, and the matter will be remanded for a new hearing.

**I.     PROCEDURAL HISTORY AND FACTS**

The following procedural history is taken from Goff's brief (Doc. No. 5) and is accepted as true by the Commissioner. (Doc. No. 8 at 1). Goff filed an application for DIB on February 19, 2003, alleging a disability since November 5, 2001, due to costovertebral[1] joint syndrome and chronic depression. Goff's application was denied at the initial level, and after a timely request was filed, a hearing was held before an Administrative Law Judge ("ALJ") on May 12, 2004. Goff and a vocational expert ("VE") appeared and offered testimony at the May 12 hearing.

On June 12, 2004, the ALJ issued an unfavorable hearing decision finding that Goff was not disabled within the meaning of the Act at any time after her onset date of November 11, 2001. Goff filed a timely request for review of the ALJ's hearing decision and her arguments were briefed to the Appeals Council.

---

[1] Costovertebral is defined as "relating to the ribs and the bodies of the thoracic vertebrae with which they articulate." Stedman's Medical Dictionary, 27th edition (2007), www.stedmans.com/section.cfm/45.

By letter dated December 29, 2004, the Appeals Council denied review, and the unfavorable hearing decision of June 10, 2004 became the Commissioner's final decision in this matter.

Goff filed a summons and complaint in this court seeking judicial review of the Commissioner's unfavorable decision. (Doc. No. 1). The Commissioner served an answer along with the Administrative Transcript. (Doc. No. 4). Goff filed her brief pursuant to General Order 18 as required. (Doc. No. 5). The Commissioner responded with a motion for summary judgment on the pleadings. (Doc. No. 8).

The court has adopted the following facts from the record, and will recite additional facts only as needed. On August 13, 2001, while working as a certified nursing assistant ("CNA"), Goff sustained an injury to her left shoulder and left side of her neck while trying to keep a patient from falling. (R. at 85, 129).[2] Goff felt a tearing sensation in her thoracic spine at T6, T7, T8 and T9 (R. at 127). Although initially diagnosed with left shoulder and neck strains (Doc. No. 116), by September 19, 2001, medical records from her treating physician, Dr. Jeffrey Gundel, indicate left costovertebral syndrome (R. at 115), a condition known to cause pain, muscle spasm, dyesthesia, and dysfunction of the costovertebral joints

---

[2] Unless otherwise noted, references ("R. at __") are to the administrative record.

of the ribs. (R. at 135-36). Dr. Gundel referred Goff to Dr. Estramonte, a chiropractor, for treatment of the costovertebral syndrome. (R. at 114). By November of 2001, Goff was taken out of work with a temporary total disability because of the severe pain of her condition and because her employer was refusing to allow her to work light duty. (R. at 114-15).

On January 2, 2002 and January 3, 2002, the workers' compensation carrier of Goff's employer had Goff examined by, respectively, its chiropractic consultant Dr. Vilko Green, and its orthopedist Dr. Barry Constantine. (Doc. No. 5 at 3; R. at 85-89, 94-97). Both doctors found that Goff was still actively symptomatic, and although she had a partial disability due to her neck, upper thoracic and shoulder pain, she could still return to light duty work. Id. On January 9, 2002, treating physician Dr. Gundel advised Goff that she could not return to her heavy duty work as a nursing assistant, and he requested that she undergo a functional capacity evaluation ("FCE"). The FCE was completed on February 18, 2002, and indicated that Goff was only capable of sedentary work with no lifting, no repetitive motion of her arms, no repetitive bending, and significantly, there was no evidence of symptom magnification by Goff. (Doc. No. 5 at 4).

Dr. Gundel also referred Goff to Dr. Oakley M. Frost, a specialist in costovertebral syndrome (R. at 99; Doc. No. 5 at 4), who examined Goff in his

office on April 23, 2002 and confirmed Dr. Gundel's diagnosis of costovertebral joint pain syndrome. (R. at 108). Dr. Frost recommended injections into the affected rib joints, but this treatment was not immediately authorized by the workers' compensation carrier. (Id.; R. at 108). Dr. Constantine again evaluated Goff on July 2, 2002 for the workers' compensation carrier, and found an on-going partial disability due to muscle strain. Constantine disagreed with the diagnosis of costovertebral syndrome and advised against the treatment offered by Dr. Frost. (Doc. No. 5 at 4; R. at 81-84).

On August 7, 2002, Dr. Frost injected Goff's left 6th, 7th, 8th and 9th costovertebral/costotransverse joint complexes with pain medication. (R. at 107, 126, 194). The injections stopped the pain completely for the duration of the anesthetic. Dr. Frost interpreted this as confirmation of the diagnosis of costovertebral joint syndrome. (R. at 105). Dr. Frost recommended a surgical procedure called costotransversectomy to remedy the impairment by removing all four of the affected costovertebral joints, and asserted that Goff was totally disabled from all work secondary to pain.( Id.)

In October of 2002, Dr. Frost advised that a prolonged delay in performing Goff's surgery would likely cause a brachial plexus injury on the left, and pain syndrome on the right. Dr. Frost also found that arterial evaluation testing was

5

positive for bilateral thoracic outlet syndrome. (R. at 102).  Goff's pain worsened over time, and by November of 2002, Dr. Frost noted increasing right costovertebral pain, as did Dr. Gundel in January 2003. (R. at 109, 192).  Goff remained disabled from work and filed for DIB under the Act on February 19, 2003. (Doc. No. 5 at 5).  The record indicates that the recommended surgery was approved in February of 2003. (R. at 109).  The record does not reveal if the surgery was ever performed.

In March of 2003, Dr. Gundel noted that Goff was suffering from chronic depression secondary to pain. (R. at 131).  Goff was examined on April 22, 2003 by state agency psychologist Dr. Annette Payne, who confirmed a diagnosis of depression, chronic pain disorder, and impaired attention and concentration due to emotionality. (R. at 139-40).  On May 1, 2003, both a physical and a mental residual functional capacity ("RFC") assessment was made by state agency reviewers.  The non-medical agency reviewer, Deborah Waterson, quoted and adopted Dr. Constantine's earlier [workers' compensation carrier] report, concluding that Dr. Constantine's findings were affirmed by agency Doctor Carol A. Wakeley.  Waterson discounted the findings of Dr. Green and Dr. Frost. (R. at 163).  Ann Herrick, Ph.D., conducted the mental RFC assessment and determined that Goff was generally capable of performing work related tasks.  Herrick

indicated that she wrote her determination as a denial. (R. at 158). Goff's DIB application was denied on May 15, 2003.

## II.   DISCUSSION

### A.   Standard of Review

This court does not review a final decision of the Commissioner de novo, but instead "must determine whether the correct legal standards were applied and whether substantial evidence supports the decision." Butts v. Barnhart, 388 F.3d 377, 384 (2d Cir. 2004) (internal citations omitted). See also Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004); Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998). "Substantial evidence" is evidence that amounts to "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Halloran, 362 F.3d at 31 (quoting Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420 (1971)). "An ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision." Gravel v. Barnhart, 360 F.Supp.2d 442, 444-45 (N.D.N.Y. 2005) (citing Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984)). When reviewing a determination by the Commissioner, a district court, in its discretion, "shall have the power to enter, upon the pleadings and transcript of record, a judgment affirming, modifying, or

reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

An individual is considered disabled for purposes of his or her eligibility for Social Security Disability if he or she is unable to

> engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]

42 U.S.C. § 423(d)(1)(A).

The Commissioner may deem an individual applicant for Social Security Disability to be disabled

> only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).

Social Security Administration regulations set forth a five-step sequential evaluation process, by which the Commissioner is to determine whether an applicant for Social Security Disability is disabled pursuant to the aforementioned

statutory definition.  See 20 C.F.R. § 404.1520.  The Second Circuit Court of Appeals summarizes this process as follows:

> The first step of this process requires the Secretary to determine whether the claimant is presently employed. If the claimant is not employed, the Secretary then determines whether the claimant has a "severe impairment" that limits [his] capacity to work. If the claimant has such an impairment, the Secretary next considers whether the claimant has an impairment that is listed in Appendix 1 of the regulations. When the claimant has such an impairment, the Secretary will find the claimant disabled. However, if the claimant does not have a listed impairment, the Secretary must determine, under the fourth step, whether the claimant possesses the residual functional capacity to perform [his] past relevant work. Finally, if the claimant is unable to perform [his] past relevant work, the Secretary determines whether the claimant is capable of performing any other work. If the claimant satisfies [his] burden of proving the requirements in the first four steps, the burden then shifts to the Secretary to prove in the fifth step that the claimant is capable of working.

Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999) (quoting Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996)).

**B.  Analysis**

    1.  Severity of Impairments

As a threshold matter, Goff asserts that the Commissioner erred in finding that none of her severe impairments, either alone or in combination, meets or

equals the level of severity of any listing.  The Commissioner counters, and the court concurs, that at the hearing Goff's counsel did not argue that Goff's impairment met or equaled a specific listing. (Doc. No. 8 at 12).  The ALJ asked the following question: "Counsel, do you think your client meets or equals a specific listing that I should look at?"  The attorney replied, "I don't think so."  (R. at 256).  On the issue of whether Goff's impairment equals any listing, therefore, the court agrees with the Commissioner that "there is no basis to remand this case for further proceedings for further consideration of this issue." (Doc. No. 8 at 12).

      2.     Treating Physician Rule

The record reveals that the ALJ relies heavily on the evaluation of non-treating physician Barry Constantine, M.D.,[3] seemingly disregarding the universal opinion by Goff's treating physicians who find that Goff is in extreme pain and is disabled.  The opinion of a treating physician is generally given more weight if it is based on well-supported, medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence. Similarly, more weight is given to the opinion of a source who has examined the plaintiff than to a non-examining source.  20 C.F.R. 404.1527 (d)(2);

---

[3]     Constantine conducted two independent medical examinations of Goff, issuing his final evaluation on July 2, 2002. (R. at 81).

416.927(d)(2).  See also Schaal v. Apfel, 134 F.3d 496, 503 (2d Cir. 1998).  Here, we have Goff's treating physicians and a pain specialist who concur that Goff was in extreme pain from costovertebral joint pain syndrome, and was, over the period covered by the record, partially to totally disabled.  However, after reciting the findings of these treating physicians, the ALJ explicitly acknowledges the weight he gives to the independent medical examination performed by Constantine, who, incredibly, advises against the procedure that would definitively show that Goff was suffering from costovertebral joint pain syndrome. (R. at 83).  In addition, the court finds that Constantine's evaluation and diagnosis preceded the diagnostic tests and definitive findings of Dr. Frost by several months.  Constantine's involvement in the case is encompassed in the period from January 3, 2002 to July 2, 2002. (R. at 81-88).  Dr. Frosts's diagnosis of costovertebral joint pain syndrome was confirmed on August 7, 2002. (R. at 105).  The court finds that the ALJ erred in not adhering to clear guidance of 20 C.F.R. 404.1527 (d)(2) and the settled law in this circuit.

       3.    ALJ's Assessment of Goff's Credibility Not Supported

After conceding that the medical evidence shows that Goff "has costovertebral joint syndrome, a history of left shoulder strain, mild dextroscoliosis, thoracic outlet syndrome, chronic pain disorder, and a depressive

11

disorder ..."[4] (R. at 15), the ALJ articulates that he does not find the plaintiff's statements concerning her impairments credible in light of the reports of the treating and examining practitioners and the findings made on examination. (R. at 16). The ALJ opines that "treating specialists have reported that the claimant is totally disabled, but there [sic] opinions are based upon the claimant's subjective allegations of pain, and are rather inconsistent, at times indicating the claimant has the ability to perform sedentary work, at other times less than sedentary work, and at other times that she is temporarily disabled or totally disabled." (R. at 18). The court has carefully reviewed the record and finds no inconsistencies such as those the ALJ asserts. The medical record developed over time, and it concerned an impairment which progressively worsened and was only positively diagnosed after a delay in permission being granted by Workers' Compensation to allow the diagnostic procedure to be done, over the objection of Dr. Constantine. (R. at 83). The court finds that the ALJ parses the evidence for credibility in a troubling manner. The ALJ asserts that at her hearing, Goff testified that she engages in a wide range of daily activities. Specifically, the ALJ writes that "she uses her

---

[4] The parties do not disagree that "these impairments have more than a minimal impact upon the claimant's ability to engage in work related activities" and are severe impairments, but do meet or equal any section of the Listing of Impairments contained in Appendix 1, Subpart P, Regulations No. 4. (R. at 15-16).

computer on a daily basis" (R. at 18), yet the transcript of that hearing reveals that Goff testified that she could only tolerate at most a half hour at the computer as it became too painful for her to sit there. (R. at 245). The ALJ reports that Goff washes dishes, cleans the sink, reads the paper, reads the Bible on a daily basis, does laundry with periodic assistance from family members, prepares meals for her family, and watches soap operas. (R. at 18). In fact, Goff testified that if she's up to it on a given day, she might clean sinks, or wash dishes. She can put the laundry in the washer and dryer if someone collects it and carries it to her (R. at 237). Goff testified that she hadn't prepared a full meal for a month, and that the previous meal preparation was with her daughter's help. (R. at 246). Goff testified that she had a cooking pan weighing two pounds that she could not lift to put in the oven. (R. at 238). Goff stated that she could pour a bowl of cereal, or make a sandwich. (R. at 236). In addition, the ALJ neglected to relate that Goff testified to being unable to go grocery shopping (R. at 237); that she couldn't go to a restaurant because it was too uncomfortable for her (R. at 242); that she had to give up her hobby of riding her bike (R. at 242); that she couldn't lift her arms to swim, and could only float in her swimming pool (R. at 245); and that she could not sleep in a bed and slept each night in a recliner chair with a massage cushion (R. at 249). In a further assessment of Goff's credibility, the ALJ also makes note

that "[w]hile [Goff] reported that she does not drive, she testified that her family has two motor vehicles, and the record indicates that only she and her husband are of driving age in the house." (R. at 18). The ALJ neglects to mention that in testifying that she had not driven in three years, Goff stated that she gave up driving because her "ability to grip the wheel is not there," mostly with her left hand, and because of the "twisting and turning that you have to do to look behind you." (R. at 236). The court finds this consistent with the medical record. The ALJ also makes much of Goff's testimony that a year prior to the hearing she was "able to go with her family on a three day road trip to shop for clothes for the kids in Reading, Pennsylvania, which consisted of a five hour drive each way." (R. at 18). The ALJ neglected to note Goff's testimony that she "was in complete agony the whole time. It wasn't even worth it." (R. at 241). The court finds that Goff's testimony sufficiently correlates with the medical evidence, and that the ALJ did not properly evaluate Goff's credibility with regard to her allegations of disabling pain and severe non-exertional limitations.

      4.     Residual Functional Capacity Assessment

In the case at bar, the ALJ has deemed the plaintiff not disabled, and able to do sedentary work despite the opinions of the plaintiff's treating physicians to the contrary. The ALJ relies on an RFC evaluation performed by a physical therapist

on February 18, 2002 (R. at 90-93), and on the RFC evaluations performed by the state agency reviewers on April 23, 2003.  As stated supra, the physical RFC evaluation included statements by, and relied on, the previous diagnosis made by Dr. Constantine.  Again, Constantine's evaluation was performed several months before Goff's impairment was accurately diagnosed.  In post-RFC medical records, Goff's treating physicians noted, <u>inter alia</u>, that Goff's impairment would render her unable to ever return to her previous nursing position, and render her unable to answer a phone or to lift anything over 10 pounds (R. at 111); that surgery was likely the only approach that would allow Goff to return to work and to live a normal life (R. at 104); and on January 14, 2003, that Goff was deemed totally disabled by Dr. Frost. (R. at 100).  Accordingly, the medical record does not support the Commissioner's residual function capacity assessment, and the matter will be remanded for another hearing based on accurate and current medical assessments.

        5.       Substantial Evidence does not support ALJ's Conclusion

In sum, the record simply does not support the Commissioner's conclusion at step five in the five-step sequential analysis that Goff is not disabled. Accordingly, the court finds that the ALJ has not met the step five burden of proof that the plaintiff is capable of working in the national economy.

## III.   CONCLUSION

For the reasons set forth in the body of this decision, the Commissioner's decision denying plaintiff's disability benefits is hereby REVERSED and REMANDED for further consideration consistent with this opinion.  The Commissioner's motion for judgment on the pleadings is DENIED.

SO ORDERED.

October 5, 2007

_____
Neal P. McCurn
Senior  U.S. District Judge